# SUPREME COURT.

## KORTRIGHT agt. BLUNT and others.

The payment of taxes upon one of several lots sold on a mortgage foreclosure, out of the surplus moneys, discharges such lot from the *lien* of the taxes. And the lien or recharge of such taxes upon the lot cannot be made, even on application of a junior incumbrancer, showing that the master paid the taxes under a mistake of fact.

A *tender* punctually made on *law day,* (the day the mortgage moneys are due,) operates a discharge of the *lien.* But if not made until *after law day*, it does not discharge the lien, unless the tender is kept good.

*New-York Special Term, March,* 1855.

THE mortgage in question, bearing date 2d Feb., 1846, was made by the defendant Joseph Blunt, then owner in fee of mortgaged premises, to Jonathan Miller, to secure $2,400, and was junior to a still larger one outstanding on the same premises, then held by the Mutual Insurance Company.

Both of these mortgages were upon premises known on the tax-rolls of the city of New-York as Nos. 8486, 8487, 8488, 8488 1-2, 8489, 1534 and 1533, of the 16th ward.

In 1846 the Mutual Insurance Company obtained a decree for foreclosure and sale under their mortgage, and report of the sale was made on the 21st May, 1847. Meantime, and on the 20th March, 1847, the plaintiff, Kortright, had become assignee and holder of the 2d of Blunt's mortgages, the same now in question.

At the master's sale, under the decree in favor of the Mutual Insurance Company, all of the lots were put up for sale by the master, and bid off—Kortright himself bidding in a portion of them, including lot No. 1533, which was the last sold.

But, on subsequently finding that the whole moneys directed by the decree to be paid, had been raised without resorting to the avails of No. 1533, the master refused to give plaintiff a deed for that lot.

.On No. 1533, at the time of such foreclosure sale, there were outstanding unpaid taxes for the years 1843, 1845, 1846.

Kortright, as the next older incumbrancer after the Mutual Insurance Company, became entitled to the whole of the surplus moneys under that sale.

From the moneys retained under the foreclosure sale, the master paid the moneys provided for by the decree and the whole of the taxes, including the assessments, on lot 1533, but refused to refund the sums paid in for taxes on 1533 after he found it unnecessary to convey that lot. The surplus then remaining, after such taxes had been paid, was something over $300, and was paid over to Kortright; and thus he, in effect, paid the taxes on 1533, since such payment diminished *pro tanto* the surplus moneys.

The equity of redemption of the mortgaged premises in question, (lot 1533,) was sold by Blunt to John H. Agnew, subject to the mortgage in question, and by Agnew was conveyed to the defendant H. C. Cady, in June, 1847.

Cady took without knowledge or notice, constructive or otherwise, that Kortright claimed the taxes on lot 1533, above mentioned, were a lien on the land; for by the tax-books they appeared to have been paid.

This suit was commenced in July, 1847. In August, 1847, Cady tendered the plaintiff's attorney the whole amount remaining unpaid on the mortgage, and the costs of suit up to that date, which the plaintiff's attorney refused to receive, unless he would also pay the aforesaid taxes on lot 1533, which the master had paid out of avails of the sale under the Mutual Insurance Company mortgage, as above stated, which sum Cady refused to pay.

The plaintiff was not in this city (his then place of residence) when that tender was made, nor had his attorney any authority to receive the money, further than was incident to his general power as attorney.

The mortgage in question is now charged on lot 1533 alone, the other lots, which it covered originally, having been sold under the Mutual Insurance Company foreclosure sale.

There is no testimony to show that Blunt knew or was apprised at the time of the tender made by Cady to the plaintiff. After such tender, Cady was made a party defendant.

JOSEPH BLUNT, *for plaintiff.*
JOHN M. VAN COTT, *for defendant.*

COWLES, Justice.   The lien of the taxes which had been charged upon lot 1533 was discharged by the payment made by the master out of the surplus moneys on foreclosure of the Mutual Insurance Company mortgage, and that lien could not be made to attach to the land again in favor of Kortright particularly, as against a subsequent and *bona fide* purchaser for value—which was the case with Cady.

This is not the case of a payment of taxes by the mortgagee voluntarily, in order to save the mortgaged premises from a tax sale, and thus tacking such lien for taxes to his mortgage, and pursuing it as a charge on the land in his own favor.   It was a payment made by mistake on the part of the master, at a time when he supposed he should need the avails of lot No. 1533, to make up the amount to be raised under that decree.   It is enough, however, so far as the defendant Cady is concerned, to say that he has purchased without knowledge or notice of the facts respecting such taxes, and they, being extinguished of record, cannot be recharged as against him.   The plaintiff, therefore, had no right to insist on the amount of those taxes being embraced in Cady's tender.

The next question is, did the tender made by Cady in August, 1847, discharge the mortgaged premises from the lien of the mortgage ?

The courts of law and equity in this state have not been agreed whether tender after law day operated a discharge of the lien of the mortgage.   The court of chancery has held that it did not. (*Merritt* agt. *Lambert,* 7 *Paige,* 344.)   The supreme court has held that it did. (*Jackson* agt. *Crofts,* 18 *J. R.* 110 ; *Edwards* agt. *Farmers' Insurance and Loan Co.,* 21 *Wend.* 467.)

Kortright agt. Blunt and others.

The case of *Post* agt. *Arnott*, (2 *Denio*, 344,) in the late court of errors, has left the question still in doubt.

Under these circumstances, I feel inclined to follow the ruling of the former court of chancery upon this question.

There are obvious reasons why a tender on the day the mortgage falls due should be held to discharge the lien. That is, the day of payment fixed by the security itself. Both parties are supposed to act in reference to it, and to know the exact amount then due. The mortgagor is then bound to pay, and the mortgagee to receive the money. Neither can be taken by surprise, and tender then by the mortgagor is equivalent to payment, so far as the right to a longer lien on the land is concerned.

But if the mortgagor allows that day to pass, and becomes thus in default, it is hardly just that he should be at liberty, after the lapse of months or years, perhaps also, after partial payments of principal and interest, to select his own time and occasion for the making of a tender, when the holder of the security may be very illy prepared to know whether the amount tendered is correct or not, and acquire by such a tender the same advantages he would had the tender been made on law day. If he allows the stipulated time of payment to pass, it seems to me it is not equitable to allow a tender of the money to discharge the lien, unless the tender is kept good, and the money afterwards brought into court. It may be said, that reasonable notice of the intention to make the tender, if made after law day, would enable the mortgagee to ascertain the exact amount due; and that after such notice, the mortgagee should be held to decline receiving the money tendered at the peril of losing the lien.

There is no little force in this view of the case, and it might be conclusive did it not leave it always as an open question, whether such reasonable notice had been given. The more simple, and, as it seems to me, equitable rule, is to hold, that if tender is punctually made on law day, it operates a discharge of the lien. But if not made until after law day, that it does not discharge the lien, unless the tender is kept good.